## UNITED STATES of America, Appellant,
### v.
## The MINNEAPOLIS & ST. LOUIS RAILWAY COMPANY, a Minnesota Corporation, Appellee.
### No. 15966.

United States Court of Appeals
Eighth Circuit.
Oct. 31, 1958.

James P. Turner, Attorney, Department of Justice, Washington, D. C. (Charles K. Rice, Asst. Atty. Gen., Joseph F. Goetten and I. Henry Kutz, Attorneys, Department of Justice, Washington, D. C., Clifford Janes, U. S. Atty., and Hyam Segell, Asst. U. S. Atty., St. Paul, Minn., on the brief), for appellant.

· Richard Musenbrock, Minneapolis, Minn. (William J. Powell and LeRoy C. Corcoran, Minneapolis, Minn., on the brief), for appellee.

Before SANBORN, WOODROUGH and VOGEL, Circuit Judges.

VOGEL, Circuit Judge.

This case involves suit for refund of federal income taxes, jurisdiction being based on 28 U.S.C.A. §§ 1346 and 1402. Taxpayer, a railroad corporation, acquired on December 1, 1943, all the assets and liabilities of a predecessor corporation and claims to be entitled to deduct wages paid by it to employees of the predecessor corporation as a result of an agreement made by taxpayer in settling a wage dispute which had existed for some time.

The facts are, with certain minor exceptions, not in dispute. The taxpayer's predecessor corporation had operated the same railroad for many years. In 1923 the United States District Court for the District of Minnesota appointed a receiver for all of the properties and assets of the predecessor. The properties of the predecessor were continuously operated by such receiver until taken over by the taxpayer on December 1, 1943. On that date, pursuant to a sale under a foreclosure decree and plan of reorganization, all properties and assets of the predecessor were conveyed to the taxpayer and from that date on the taxpayer has owned, operated and managed such properties.

The foreclosure decree, with exceptions not here pertinent, provided:

"Purchaser To Pay And Discharge Certain Costs, Compensations, Expenses And Liabilities

"The purchaser of the property directed by this decree to be sold, in addition to the amount of the accepted bid or bids for such property, and as part of the consideration for such property, and as part of the purchase price thereof, shall

\* \* \* \* \* \*

"(2) assume and discharge all contracts, leases and agreements entered into, made, assumed or adopted by the receiver, except \* \* \*."

On September 25, 1942, 73 classes of railway employees represented by 15 co-operating railway labor organizations served notice on railways in general, including the predecessor corporation, demanding an increase in the wages of such employees effective October 25, 1942. Predecessor had existing agree-

ments with 10 labor organizations represented by the 15 cooperating railway organizations, and these 10 organizations specifically served notices dated September 25, 1942, of the demands under the provisions of the Railway Labor Act, 45 U.S.C.A. § 151 et seq.

The Western Carriers Conference Committee represented both predecessor and taxpayer in the dispute. The ensuing controversy employed the services of the National Mediation Board, the National Railroad Labor Panel, the Sharfman Board, the Director of Economic Stabilization, the Director of War Mobilization, the Shaw Board and the Special Emergency Board in the sixteen months period that it consumed.

On December 1, 1943, the date of taxpayer's acquisition and some 14 months after negotiations had started, several suggestions and proposals had evolved but none had been accepted so as to give rise to a liability upon taxpayer's predecessor. It was not until a threatened railroad strike on December 30, 1943, halted only by the government's taking possession, control and operation of the nation's railroads on December 27th, that on January 17, 1944, an agreement was reached and a contract executed giving the employees an eight-cent an hour increase retroactive to February 1, 1943. This was six weeks after taxpayer became owner of the railroad in accordance with the foreclosure decree. Although this contract, in substance, is the same plan which the Shaw Board had previously recommended and to become effective on November 19, 1943, the effectiveness of that plan was enjoined by the National Mediation Board. Then, only at this time, January 17, 1944, an obligation arose upon the railroad employers, including the taxpayer herein, to pay the wages agreed upon in the contract. Prior to this there was no legal obligation to pay the additional wages.

On January 18, 1944, the nation's railroads were returned to their owners and were authorized under existing law by the Chairman of the National Railway Labor Panel and the Commissioner of Internal Revenue to pay the wage and salary increases in conformity with the agreement of January 17, 1944.

During its taxable year 1944 taxpayer paid the retroactive wage increases for the period February 1, 1943, to November 30, 1943, both inclusive, as required of it by the agreement of January 17, 1944, in the amount of $380,-571.33, together with the sum of $22,-907.66 into the Treasury of the United States as payroll taxes on account of the retroactive wage increases. It also paid the retroactive wage increases for the short period December 1, 1943, to December 30, 1943, and claimed a deduction therefor. Such claim was allowed and is not in issue here.

For tax purposes predecessor's 1943 fiscal year ended on November 30, 1943, and predecessor made a federal income tax return for the period January 1, 1943, to November 30, 1943, both inclusive. Taxpayer made a federal income tax return for the period December 1, 1943, to December 31, 1943, both inclusive.

Predecessor set up on its books during 1943 a reserve in the sum of $345,000 to meet estimated wage claims and the sum of $21,562.50 as estimated payroll taxes. In its tax return for the period January 1, 1943, to November 30, 1943, both inclusive, predecessor claimed the estimated amounts as a deduction. Thereafter the books of predecessor were reviewed by the Internal Revenue agent in charge of the St. Paul Internal Revenue office, and under date of November 27, 1949, adjustments were made in the return to reflect deductions for retroactive wages and payroll taxes of $380,-571.33 and $22,907.66, respectively.

Predecessor had carry-over losses from its tax year 1941 when it filed its 1943 tax return and the credit it received in the 1943 return for tax deductions by reason of the retroactive wages and payroll taxes, which it had reserved on its books, merely reduced the carry-over losses, so that no tax payment was made or required to be made to the government

on the basis of its 1943 return. Moreover, after the adjustments were made by the Internal Revenue Bureau on November 27, 1949, as above explained, there still remained substantial carry-over losses to the credit of the predecessor. It was stipulated that the predecessor corporation for its eleven-month period in 1943 had an unused net operating loss carry-over from the year 1941 of $1,075,494.94. If we assume that the items deducted by the predecessor out of its return for 1943 were improperly taken and allow them to the successor corporation in its 1944 return, the unused net operating carry-over for the year 1941 would be reduced to an unused carry-over of $672,015.95, which would have still off-set the net operating profit of the predecessor and result in no tax for 1943.

Both predecessor and taxpayer for the years 1943 and 1944 made federal income tax returns on the accrual basis and not on a cash basis.

The District Court found as a fact part of the matters in dispute herein, namely, that the predecessor had no obligation, fixed or contingent to pay retroactive wage increases and that the taxpayer had not agreed to discharge any such liabilities in purchasing the predecessor's assets.

Based on these findings, the District Court concluded that the payment of the retroactive wage increase was properly deductible by taxpayer in 1944 and ordered a refund of income taxes for that year of $169,461.18 plus interest.

The issue herein is whether or not the taxpayer can deduct as an ordinary and necessary business expense of 1944 the retroactive wage payments on account of services rendered its predecessor during the period February 1, 1943, to November 30, 1943.

It has been the government's position that the payment of the retroactive wage increases for services rendered the predecessor in 1943 should properly be considered as the discharge of an obligation of the predecessor which was assumed by taxpayer along with other obligations in the foreclosure sale. The government therefore claims that it should be treated for tax purposes as part of the costs of acquiring assets of the predecessor and properly represents a capital expenditure and not a deductible business expense of 1944.

In allowing the deduction, the District Court said:

"In order for the payment of these retroactive wages to be characterized as a capital expenditure, there must be a showing that either these wages were an actual liability of the predecessor corporation on December 1, 1943, or that the parties agreed expressly or impliedly that the purchaser, as a part of the consideration for the purchase of the assets of the receivership corporation, agreed to pay any retroactive wages which might ensue from any settlement of the wage dispute then pending. Admittedly, the dispute as it existed on December 1, 1943, did not constitute an obligation or liability within the meaning of the final decree. At best, on December 1, 1943, the receivership corporation was involved in a labor dispute common to all carriers in the Nation. The assets of the receivership corporation were not at that time saddled with any liability or obligation to depart from the terms of the December 15, 1941, contract which it had entered into with the non-operating employees with the approval of the receivership court. And *when the settlement of January 17, 1944, was effected, the obligation assumed and paid by the carriers of the Nation in that year became a business expense of that year as a part of a nationwide settlement with the various classes of non-operating employees.* The Government seeks to constitute the payment of the retroactive wages by plaintiff as a capital expenditure by implying some tacit understanding between the parties that the appar-

ent imminent settlement of the wage dispute entered into the consideration of the sale to the plaintiff. But to indulge in unsubstantiated conjecture or assumptions as to what the parties may have had in their minds as to the impact of the pending labor dispute on the determination of a fair and equitable price for the receivership assets, will not suffice." (Emphasis supplied.)

The government contends that the decision of this court in Holdcroft Transportation Co. v. Commissioner, 8 Cir., 1946, 153 F.2d 323, is most nearly in point and states, "The Government's position is that the principle of the Holdcroft decision is determinative of this appeal." That case, in substance, held that where the taxpayer acquired the business and assets of a partnership in exchange for taxpayer's common stock and the assumption by taxpayer of the liabilities of the partnership, including two pending suits for damages arising out of an automobile collision, the amounts paid by the taxpayer in settlement of the pending suits against the partnership were "capital expenditures" and not deductible in computing income and excess profits taxes as "ordinary and necessary business expenses". There the amounts paid by the taxpayer in settlement of the suits against the partnership were a part of the purchase price of the partnership's assets and accordingly were capital expenditures and not current expenses or losses of the business of the taxpayer. Furthermore, the Holdcroft case involved tort liability which accrues immediately upon the occurrence of the tort. Additionally, the tort claims did not arise out of the operation of the business of the taxpayer. We conclude that the Holdcroft case is no support for the government's contention herein.

■ It should be noted that the District Court found as a fact that the predecessor corporation had no obligation, fixed or contingent, to pay the retroactive wage increases in question and further found that the taxpayer had not agreed to discharge any such liabilities in its purchase of the predecessor's assets. The District Court further pointed out that, "The record does not disclose the slightest indication that any settlement of the dispute was given consideration by the parties in arriving at the sale price which was approved by this Court." The District Court found the affirmative act of the taxpayer in agreeing to the wage settlement of January 17, 1944, created the liability to pay the retroactive wages here in question; and thereby taxpayer was paying its own debt and not any debt of predecessor company or its receiver. These are fact determinations supported by substantial testimony, are not clearly erroneous or against the clear weight of the evidence, nor induced by an erroneous view of the law and may not be disturbed or reversed here. See Cleo Syrup Corp. v. Coca-Cola Co., 8 Cir., 1943, 139 F.2d 416, 417–418, 150 A.L.R. 1056, certiorari denied 321 U.S. 781, 64 S.Ct. 638, 88 L. Ed. 1074, and Rule 52(a), Federal Rules of Civil Procedure, 28 U.S.C.A.

■ The findings of the District Court to the effect that the retroactive wages were not an actual liability of the predecessor corporation on December 1, 1943, and, further, that the taxpayer had not agreed to discharge any such liabilities and that settlement of the wage dispute was not given consideration by the parties in arriving at the sale price on December 1, 1943, which findings as we point out may not be disturbed herein, force the conclusion that this case is determined, insofar as the law is concerned, by Lucas v. Ox Fibre Brush Co., 1930, 281 U.S. 115, 50 S.Ct. 273, 274, 74 L.Ed. 733. Therein, two officers were paid substantial amounts by vote of the Board of Directors of a corporation " 'as extra compensation for his past services to this company as an officer thereof and in any other capacity' ". The question there was whether the payments for past services were properly deductible in the year in which they were paid as "ordinary and necessary expenses paid or incurred during

the taxable year in carrying on any trade or business, including a reasonable allowance for salaries * * *", under § 234(a) (1) Revenue Act of 1918 (40 Stat. 1057, 1077) (which statute is identical with the one with which we are here concerned). There the Commissioner disallowed the deduction. The Board of Tax Appeals held likewise. The Circuit Court of Appeals reversed, Ox Fibre Brush Co. v. Blair, 4 Cir., 32 F. 2d 42, 68 A.L.R. 696. In sustaining such reversal, Mr. Chief Justice Hughes, speaking for the Supreme Court, stated, at page 119 of 281 U.S., at page 274 of 50 S.Ct.:

"The payments in the present instance were actually made in the year 1920. *The expenses represented by these payments were incurred in that year, for it is undisputed that there was no prior agreement or legal obligation to pay the additional compensation.* This compensation for past services, it being admitted that it was reasonable in amount in view of the large benefits which the corporation had received as the fruits of these services, the corporation had a right to pay, if it saw fit. There is no suggestion of attempted evasion or abuse. The payments were made as a matter of internal policy having appropriate regard to the advantage of recognition of skill and fidelity as a stimulus to continued effort. There was nothing in the income tax law to preclude such action. On the contrary, the payments fell directly within the provision of section 234(a) as a reasonable allowance for compensation for personal services actually rendered. *The statute does not require that the services should be actually rendered during the taxable year, but that the payments therefor shall be proper expenses paid or incurred during the taxable year.* (Emphasis supplied.)

\* \* \* \* \* \*

" * * * In the present instance, the expense could not be attributed to earlier years, for it was neither paid nor incurred in those years. There was no earlier accrual of liability. It was deductible in the year 1920 or not at all."

In the instant case, the situation is identical. The payments in question were actually made by the taxpayer in the year 1944. The expenses represented by such payments were incurred in 1944 for it cannot be disputed that *there was no prior agreement or legal obligation to pay for the additional compensation.* The taxpayer not only had the right to pay it but it had to pay it if it was going to continue in business. There is no suggestion of attempted evasion or abuse, and, as the Supreme Court stated, the statute does not require that the services should be actually rendered during the taxable year. It is sufficient if the payments represent proper expenses paid or incurred during the taxable year. Clearly, here the liability which was based on contract did not accrue until the agreement of January 17, 1944.

In Security Flour Mills Co. v. Commissioner of Internal Revenue, 1944, 321 U.S. 281, 286–287, 64 S.Ct. 596, 598, 88 L.Ed. 725, the Supreme Court stated:

"The rationale of the system is this: 'It is the essence of any system of taxation that it should produce revenue ascertainable, and payable to the government, at regular intervals. Only by such a system is it practicable to produce a regular flow of income and apply methods of accounting, assessment, and collection capable of practical operation.'

"This legal principle has often been stated and applied. *The uniform result has been denial both to the government and to taxpayer of the privilege of allocating income or outgo to a year other than the year of actual receipt or payment, or, applying the accrual basis, the year in which the right to receive,*

*or the obligation to pay, has become final and definite in amount."* (Emphasis supplied.)

In Dixie Pine Products Co. v. Commissioner of Internal Revenue, 1944, 320 U.S. 516, 519, 64 S.Ct. 364, 365, 88 L. Ed. 270, the Supreme Court said:

"It has long been held that in order truly to reflect, the income of a given year, *all the events must occur in that year which fix the amount and the fact of the taxpayer's liability for the items of indebtedness deducted though not paid; and this cannot be the case where the liability is contingent and is contested by the taxpayer."* (Emphasis supplied.)

In the instant case as of December 1, 1943, there existed a dispute between the employees and the railroads with reference to an increase in wages and the payment of additional wages for past services. The liability, if any, was contingent and contested. No final agreement had been made. No legal obligation existed. This court, in Craig v. Thompson, 8 Cir., 1949, 177 F.2d 457, 460, said:

"It is equally true that a taxpayer on the accrual basis must accrue income in the year in which the amount of the income is reasonably determinable, and the same rule applies to deductions for expenses. Continental Tie & Lumber Co. v. United States, 286 U.S. 290, 52 S. Ct. 529, 76 L.Ed. 1111; Spring City Foundry Co. v. Commissioner, 292 U.S. 182, 54 S.Ct. 644, 78 L.Ed. 1200; United States v. Anderson, supra [269 U.S. 422, 46 S.Ct. 131, 70 L.Ed. 347]."

The government argues that certain facts "indicate the existence of such an obligation" and that "every practical common sense point of view" fixes the payment of the retroactive increase as the obligation of the predecessor. If there were inferences to be drawn from the stipulated facts, it was the duty of the trial court to draw them and where such inferences as drawn are supported by substantial evidence, as they are here, they may not be disturbed. Additionally, it should be pointed out that for many years and up to December 1, 1943, the time of the sale, the predecessor was in receivership and was under the jurisdiction and control of the court from which the current appeal is being prosecuted. The sale from the predecessor to the taxpayer on December 1, 1943, was under a foreclosure decree and plan of reorganization which had to be approved by that court, which accordingly was in a peculiarly apt position to know what was meant by or intended by the foreclosure decree and sale of December 1, 1943.

We agree with the trial court in its statement:

"It is true that plaintiff agreed to pay and did pay retroactive wages to employees who had performed no services for it during the retroactive period. But in so doing it was not paying an obligation of another. The settlement of a nation-wide dispute necessarily had to be adjusted on the same basis by all carriers. Realistically, therefore, plaintiff was in no position to quarrel or dispute about the provision with reference to retroactive wages. *Obviously, it was required to go along with the other carriers which likewise were required to accept that obligation as one of the expenses of carrying on the railroad business of the Nation during the year 1944."* (Emphasis supplied.)

The District Court committed no error in holding that the retroactive wage payments made in 1944 were deductible expenses of doing business in that year and not a liability assumed by it in the reorganization of the predecessor corporation.

The government also contends that even if the payment of the increases in question was not in discharge of an assumed obligation, the District Court erred in determining that the taxpayer

**670**

had sustained the burden of proving that it was entitled to a deduction for an ordinary and necessary business expense. We think the stipulated facts support the trial court's conclusions that the expenses paid in 1944 were ordinary and necessary business expense incurred by the taxpayer in 1944 and find nothing to support the government's contention that the burden of proof was erroneously placed upon the government. A restatement of the facts so stipulated would not be helpful.

The judgment appealed from is affirmed.